UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| William Clayton,<br>    *Plaintiff*,<br><br>    *v.*<br><br>City of Middletown, Dominique Thornton, John Edward Brymer, Jr., and Philip Pessina,<br>    *Defendants*. | Civil No. 3:06cv667 (JBA) |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Clayton was formerly a police officer in Middletown, Connecticut. In 2002, he was involved in an on-duty altercation with a superior officer which resulted in a suspension pending an internal investigation and a separate criminal investigation. Eight months later, the Middletown Chief of Police, Defendant Edward Brymer, Jr., recommended to the Mayor, Defendant Dominique Thornton, that Clayton be terminated, although the final hearing on the recommended termination never took place as Plaintiff instead retired. Plaintiff subsequently sued the City of Middletown, Thornton, Brymer, and former police captain Philip Pessina, claiming that he suffered adverse employment action in retaliation for protected First Amendment activities, that the Defendants violated his equal-protection rights under both "class of one" and "selective prosecution" theories, and that he was denied due process in the disciplinary proceedings which led to his retirement. The Defendants have moved for summary judgment on all claims.

I.     **Factual Background**

The relevant facts, taken in the light most favorable to Plaintiff as the non-moving party, are as follows. Clayton was employed by the Middletown Police Department ("MPD") as a police officer from 1983 until his retirement in May 2003, during which time he also

held numerous elected or appointed positions in the police officer's union Local 1361. (Defs.' Loc. R. 56(a)1 Stmt. ¶¶ 9–11.) The chain of events culminating in this lawsuit began on September 18, 2002, when an MPD lieutenant, Frank Violissi, took possession of an out-of-service police safe without authorization and while off duty. (*Id.* ¶ 22.) That same day, Clayton told Pessina what Violissi had done, who informed Brymer, who then instructed another person to have Violissi return the safe. (*Id.* ¶¶ 24–27.) Brymer telephoned Clayton that evening to tell him that Violissi would be returning the safe. (*Id.* ¶ 28.) On September 19, Clayton requested an official case number and used an MPD computer and police form to prepare a report of Violissi's "suspicious activity," but he never completed the report or gave it to any of the Defendants. (*Id.* ¶¶ 31, 39–42.) Clayton's normal daily duties as an officer included investigating and preparing reports regarding "generic crimes," such as theft, and Clayton testified that it was "routine procedure" to obtain a "case number, to time stamp that something actually took place, and . . . put facts on paper." (*Id.* ¶¶ 32–34.)

On September 25, Captain Pessina called Clayton away from duty at the front desk at police headquarters to speak privately in the adjacent hallway about a union-related overtime issue involving Lieutenant Violissi which Clayton had brought to Pessina's attention the previous day. (*Id.* ¶¶ 44–47.) Clayton asserts that he had previously asked Pessina not to tell Violissi about the issue because Violissi was already angry with Clayton for expressing concern about the "theft" of the safe. (Clayton Dep. 151:20–152:5, July 26, 2007.) While Pessina and Clayton were talking, Violissi entered the hallway and a verbal exchange ensued between Violissi and Clayton, during which Pessina returned to his office. (Defs.' Stmt. ¶¶ 50–55.) After Violissi ordered Clayton back to the front desk, the verbal confrontation escalated into a physical one, part of which was witnessed by Pessina when he

2

reemerged from his office. (*Id.* ¶¶ 57-60.) Although there are competing versions of what happened between the two men, there is no dispute that, at some point, Violissi grabbed Clayton by the shirt and dragged him down the hallway toward Pessina's office. (Pl.'s Loc. R. 56(a)2 Stmt. ¶ A.58.) Pessina witnessed the struggle and claims he saw Clayton punch Violissi, causing a cut over his eye requiring hospital treatment. (Defs.' Stmt. ¶¶ 60, 63). Pessina prevented Clayton from arresting Violissi on the spot, and Clayton said he was going to the hospital to make the arrest; when Pessina ordered him not to, Clayton replied that he was "disobeying that order." (*Id.* ¶¶ 62–65.) Clayton did not follow through on his intended arrest of Violissi, however. (Clayton Dep. 176:10.)[1]

On September 27, Captain Lynn Baldoni placed both Clayton and Violissi on administrative leave, with pay, pending internal investigation. (Defs.' Stmt. ¶¶ 77, 74.) Her investigation lasted six months and included review of the results of the separate criminal investigation conducted by Captain Christopher Barrow, photos and diagrams of the crime scene, video of the front desk area, witness statements, and medical reports of Violissi's injury. Baldoni also conducted interviews or inquiries with approximately sixty MPD

---

[1] In his summary judgment briefing, Plaintiff has repeatedly disputed Defendants' version of his role in the altercation and denies he ever hit Violissi. (Pl.'s Stmt. ¶¶ A.50–61.) Clayton suggests that other evidence was ignored in the investigation into the altercation, including forensic evidence that his handcuffs showed no evidence of being used to hit Violissi (Pl.'s Ex. 27) and that, although Violissi alleged bruising on his chest (Pl.'s Ex. 28), the bruises were the wrong color to have been made at that time (Pl.'s Ex. 29). During the investigation, on March 13, 2003, Captain Baldoni recorded an interview with Clayton, attended by his union attorney. (Defs.' Ex. 20.) Clayton denies that Baldoni's report of this interview "accurately reflects Plaintiff's testimony." (Pl.'s Stmt. ¶ A.86.) These factual disputes are not genuine issues of material fact regarding any claim at issue in this case, however, because they have nothing to do with whether Clayton was retaliated against for his allegedly protected speech, whether he was treated differently than a similarly situated officer, or whether his due-process rights were violated.

3

members and employees. (*Id.* ¶ 81.)² On April 2, 2003, Baldoni submitted her official reports and recommended that Clayton be charged with violating six MPD regulations: § 304.1 (duty to obey), § 304.11 (language), § 304.17 (civility), § 304.8 (malfeasance, nonfeasance, or misfeasance), § 304.21 (respect), and § 304.22 (insubordination). (*Id.* ¶¶ 89, 94.) Baldoni then issued a notice of a pre-disciplinary hearing (referred to by Defendants as a *Loudermill* hearing) scheduled for April 10, 2003. (*Id.* ¶¶ 98, 102.) At the hearing on April 16, Baldoni presented the report of her investigation in support of the disciplinary charges against Clayton. (*Id.* ¶ 105.) He declined to make any statements on the advice of counsel due to the pending criminal investigation, although his attorney spoke on his behalf and tried to "shift[] responsibility from Officer Clayton to Capt. Pessina." (*Id.* ¶ 106; Defs.' Ex. 23 at 3.)³ Chief Brymer concluded that no new information had been provided which justified altering any of the charges recommended by Baldoni. (*Id.* ¶ 108.) In a letter to Mayor Thornton, Brymer wrote that "based upon [his] review of all the evidence and [Plaintiff's] past history, which includes a 90-day suspension," he recommended terminating Clayton's employment. (Defs.' Ex. 23 at 1.)

---

² Brymer directed Captain Barrow to conduct a preliminary criminal investigation into the matter. Violissi, Pessina, and six other people submitted written accounts of the incident; Clayton declined to provide a written statement on advice of his attorney. (*Id.* ¶¶ 66–69.) On September 30, 2002, Captain Barrow gave his completed report to the state's attorney. (*Id.* ¶ 72.) Clayton provided a sworn statement to Inspector Kmez of the Chief State's Attorney's office on March 4, 2003, and on April 30, Kmez obtained an arrest warrant charging Clayton with assault and making a false statement. (*Id.* ¶ 74.) The latter charge was dropped and Clayton was granted accelerated rehabilitation on the assault charge pursuant to Connecticut General Statutes § 54-56e. (*Id.* ¶ 75.) As part of his accelerated rehabilitation, Clayton admitted the factual allegations underlying the criminal charges, and after a six-month probation period, the assault charge was dismissed. (Pl.'s Ex. 37.)

³ The transcript of this hearing is not part of the summary judgment record.

Pursuant to Article 23 of their union's collective bargaining agreement, MPD officers subject to discipline greater than a written warning are entitled to an evidentiary fact-finding hearing ("Article 23 hearing"). (*Id.* ¶ 118.) In a letter dated April 30, 2003, Thornton informed Plaintiff and the police union that she was convening an Article 23 hearing for Clayton on May 8, 2003. (*Id.* ¶ 120.) Clayton did not attend this hearing, but his attorney attended on his behalf and at the outset formally announced Clayton's retirement from the MPD. (*Id.* ¶¶ 123–25.) At his deposition, Clayton testified about this decision:

> [I]f you can take door A, which is get out before they fire you, I would take that versus flipping a coin as to what happens if you get fired. . . . My thought process was that I had to protect my livelihood and the only guaranteed way to do that, because I'm not a gambler, was to retire to protect my pension and health insurance.

(Clayton Dep. 189:15–17, 204:8–11.) With Clayton's absence and announced retirement, the City did not proceed with the Article 23 hearing. (Defs.' Stmt. ¶ 134.)

Captain Baldoni had also investigated the conduct of Lieutenant Violissi and recommended that he be charged with violations of four MPD regulations: § 304.1 (duty to obey), § 304.11 (language), § 304.17 (civility), and § 304.8 (malfeasance, nonfeasance, or misfeasance). (*Id.* ¶ 96.) Violissi's pre-disciplinary hearing was held on April 10, 2003, after which Chief Brymer adopted the charges recommended by Captain Baldoni. (*Id.* ¶ 117.) The Mayor informed Violissi that she was convening an Article 23 hearing for him, which he waived; Violissi instead challenged his discipline through an arbitration proceeding which reduced his unpaid suspension from thirty to fifteen days. (*Id.* ¶¶ 122, 140.)

5

II.  **First Amendment Retaliation**

A.  **Legal Principles**[4]

In order to prevail on a claim of First Amendment retaliation, a plaintiff must establish that "(1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, (3) and a causal connection exists between the speech and the employment decision, such that it can be said that his speech was a motivating factor in the determination." *Morris v. Landau*, 196 F.3d 102, 110 (2d. Cir. 1999).

The first element of a retaliation claim is that the allegedly targeted expression qualifies for First Amendment protection as speech by "a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. In *Garcetti*, Ceballos, a calendar deputy in a district attorney's office, believed an affidavit used to obtain a search warrant contained serious misrepresentations and, speaking as "a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," conveyed his opinion in a memo to his supervisor. *Id.* at 413–14, 421. Critical to the Court's conclusion that his opinion was not protected speech was not that "Ceballos expressed his views inside his office, rather than publicly," nor that the "memo concerned the subject matter of [his] employment," but rather that "his expressions were made pursuant to his

---

[4] The well-known summary judgment standard is familiar to the Court and will be applied without recitation in detail. *See, e.g., Milardo v. City of Middletown*, 528 F. Supp. 2d 41, 44–45 (D. Conn. 2007).

6

duties as a calendar deputy." *Id.* at 420–21.

The second element of a retaliation claim is that the employer took an adverse action against the employee-plaintiff. Sufficiently adverse actions include terminations, refusals to promote, demotions, reprimands, and may also encompass negative evaluations and disciplinary accusations. *Morris*, 196 F.3d at 110. In some circumstances, "the institution of disciplinary proceedings [may be] sufficient . . . to constitute an adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (citing *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 313–14 (2d. Cir. 2005)). In *Burkybile*, the Second Circuit observed that "an adverse employment action is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" and also that the "threat of a [disciplinary] hearing could have such a deterrent effect." 411 F.3d at 313–14; *see also Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (explaining that the threat of administrative disciplinary proceedings and thirty-day suspension without pay created an issue of fact as to the existence of an adverse employment action).

Third, there must be a causal connection between the protected expression and the employer's adverse action. This causal link requires evidence that the speech was a substantial or motivating factor in the putative adverse employment decision. *Skehan,* 465 F.3d at 106. A plaintiff "must aver some tangible proof demonstrating that [his] protected speech animated [the Defendants'] decision [and] may not rely on conclusory assertions of retaliatory motive." *Washington,* 373 F.3d at 321. Causation can be proven "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who

7

engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). "The cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). There is no bright-line rule as to what constitutes "very close," and the Second Circuit has declined to "nail down the elusive outer limit," though certain time periods have been found to be too long a time to support an inference of a causal connection. *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554–55 (2d. Cir. 2001) (surveying various cases finding three months too long and two months sufficient, and that five months may suffice where there is evidence of subsequent exercises of free speech rights and retaliatory actions).

B.  Discussion

In this case, Plaintiff claims he suffered adverse employment action in retaliation for his verbal expressions of concern regarding the alleged theft of the safe by Violissi and for the report he began about the same incident. Clayton argues that he was acting as a private citizen in these circumstances—and therefore not "speaking" as a police officer under *Garcetti*—because it is the responsibility of internal affairs investigators, not patrol officers, to investigate police misconduct. But this tenuous distinction is weakened by Clayton's statements elsewhere that investigating theft is within the scope of a patrol officer's work.[5]

---

[5] According to the MPD rules and regulations, "[a]n internal affairs investigation shall be initiated upon receipt of a civilian complaint referral form or upon request from the Chief of Police." (Pl.'s Ex. 1 at 55.) Clayton did not use the form available to civilians.

8

Furthermore, Clayton stopped working on the report when he was placed on administrative leave on September 27, undercutting his position that his complaints about Violissi were matters related to public concern rather than intradepartmental politics or work dynamics. Nonetheless, even assuming that Clayton did engage in some constitutionally protected activity, he has to show that his comments and/or report about the safe incident prompted an unlawful response by the Defendants, where the record lacks evidence both that Defendants reacted with retaliatory animus and that Clayton experienced an adverse employment action.

Plaintiff clarified at oral argument that the adverse employment action he claimed was his initial suspension with pay following the incident with Violissi. In support of this, Clayton relies on *Skehan*, a case which involved police officers who alleged they were unlawfully suspended without pay for speaking out "against race-based decisionmaking and cover-ups of misconduct within the department." 465 F.3d at 102, 105. The *Skehan* panel, following *Burkybile*, concluded that simply initiating disciplinary proceedings can constitute an adverse employment action. *Id.* at 106. But where an employee is suspended or put on leave *with pay* in accordance with the employer's disciplinary framework, the situation is generally different. In *Joseph v. Leavitt*, 465 F.3d 87, 88-89 (2d Cir. 2006), an FDA consumer safety officer was placed on paid administrative leave after being arrested for assaulting his girlfriend, pending criminal and internal investigations. The Second Circuit held that this paid leave did not amount to an adverse employment action necessary for his retaliation claim:

> [Other] circuits have reasoned that the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances. We agree that

9

> an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner. . . . We [hold] that administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action.

*Id.* at 91. The same conclusion is appropriate here. Clayton was placed on paid leave on September 27, 2002, after the incident with Violissi, pending Baldoni's investigation, and without more, this leave did not constitute a materially adverse change in Clayton's employment.

Therefore, only the disciplinary recommendation and Article 23 hearing occurring more than six months later, after Baldoni completed her investigation, can suffice as adverse actions, but Plaintiff offers no causal connection between his expression and these claimed adverse actions in April and May 2003. Clayton urges that causation is shown by the "continuous course of conduct that commences shortly after Plaintiff's expression of opinion regarding Violissi's criminal conduct [on September 18] that does not let up until Plaintiff submits his resignation." (Pl.'s Opp'n at 38.) Clayton paints a picture of Pessina "priming" Violissi against him, "deliberately or []recklessly" setting the stage for an assault on the Plaintiff by Violissi on September 25, and "fleeing the scene as the altercation erupted." (*Id.* at 35, 37.) Plaintiff's vivid characterization notwithstanding, no reasonable fact-finder could conclude that the disciplinary procedures in April and May 2003 were causally connected to his expressive conduct six months earlier. The hearing held on April 16, 2003 and the Article 23 hearing scheduled for May 8 were linked to the verbal and physical altercation with Violissi, not the complaints about the safe. Clayton's claim depends on the City having unlawfully retaliated against him because of his protected speech, a position which has no support in the record other than Clayton's conclusory and self-serving assertions. *Compare*

10

*Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (finding evidence of an employer's unlawful retaliatory response based on statements by superiors that the employee's expression might adversely affect his career and comments placed in his personnel file regarding protected activity); *with Washington*, 373 F.3d at 321 (rejecting plaintiffs' "bald assertions" as insufficient "to establish a nexus between plaintiffs' protected speech and the [employer's] decision to file disciplinary charges").

As in *Washington*, there is no evidence of retaliatory animus in this case. Clayton contends that "Defendants' references" to his full employment record creates an inference that all of the discipline—including the discipline at issue in this case—was imposed to punish First Amendment activity. (Pl.'s Stmt. ¶¶ A.12-15; Pl.'s Opp'n at 38.) Brymer's letter to Thornton indeed recommended terminating Clayton's employment "based upon [his] review of all the evidence and [Plaintiff's] past history, which include[d] a 90-day suspension." (Ex. 23.) But performance evaluations in his personnel file for the two years prior to the Violissi incident demonstrate he was consistently evaluated as meeting and occasionally exceeding department standards. (Pl.'s Exs. 16–23.) Unlike the plaintiff in *Mandell*, there is no support for that earlier allegedly protected activity—specifically, incidents from 1996—having influenced Clayton's most recent performance evaluations.

Thus, Clayton has proffered no evidence that would permit a reasonable jury to conclude that there is a nexus between his expression of opinion regarding Violissi's alleged theft of the safe and the disciplinary hearings which followed over six months later. Even though what Clayton said or did regarding the theft of the safe may have led to his confrontation with Violissi, the record reveals that the discipline which followed was a reaction to not Clayton's expressive activity but rather the fact that he and Violissi got into

11

a verbal and physical altercation at the workplace. Accordingly, summary judgment is appropriate on Plaintiff's retaliation claim.

## III. Equal Protection

### A. Class of One

Clayton asserts he was "singled out for unfair and intentionally discriminatory treatment compared to other similarly situated employees of Middletown (i.e., Violissi)" without any rational basis for the disparate treatment. (Am. Compl. ¶ 48-49.) He characterizes this as a "class of one" equal-protection claim. Subsequent to oral argument, however, the Supreme Court held that the "class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dept. of Agric.*, 128 S. Ct. 2146, 2151 (2008). Therefore, this claim is no longer viable.

### B. Selective Prosecution

Plaintiff also alleges that he was subjected to "selective mistreatment due to his exercise of his First Amendment rights" and that the "Defendants were motivated by a desire to retaliate against Plaintiff for engaging in First Amendment protected activity." (Pl.'s Opp'n at 39–40; Am. Compl. ¶¶ 50–51.) In the Second Circuit, "[t]o succeed in an action alleging selective prosecution, plaintiffs in this Circuit have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cobb v. Pozzi,* 363 F.3d 89, 110 (2d. Cir. 2004). Similar to the plaintiffs in *Cobb*, "[d]ue to the manner in which [he has] cast [his] contentions throughout this action, [P]laintiff['s] selective prosecution and [First Amendment] retaliation claims

coalesce." *Cobb*, 363 F.3d at 110. With the Court's conclusion that no reasonable jury could conclude that Clayton suffered an adverse employment action in retaliation for allegedly protected First Amendment activity, summary judgment on his selective-prosecution claim is appropriate as well.[6]

## IV. Procedural Due Process

Plaintiff asserts that he was not afforded due process in the events leading to his retirement, contending that his pre-termination hearing was inadequate because he had no protection against self-incrimination in connection with the criminal charges pending against him; that the hearing was insufficient under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), because he was never permitted to invoke the discretion of a final and/or impartial decision-maker; and that he was compelled to retire because the outcome of the subsequent Article 23 hearing was pre-determined.

"[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." *Gilbert v. Homar*, 520 U.S. 924, 927-28 (1997). The parties agree that Clayton was such an employee with a property interest in his continued employment, and so was "'entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story,' before [being] subjected to the loss of employment." *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002) (quoting *Loudermill*, 470 U.S. at 546). Before he could lawfully be deprived of his employment, the Plaintiff must have had an "opportunity to be heard at a meaningful time and in a

---

[6] This conclusion obviates the need to decide whether *Engquist* also bars Clayton's selective-prosecution equal-protection claim.

meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (quotation marks omitted). In dismissal-for-cause cases, "the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect[, because] permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action." *Loudermill*, 470 U.S. at 543, n. 8.

### A. Notice of the Charges and Explanation of the Evidence

Clayton does not contest the first two procedural requirements under *Loudermill*. He agrees that he received written notice of the charges against him in a letter sent April 2, 2003. This letter described the allegations of misconduct which resulted from Baldoni's months-long internal investigation into the incident between Clayton and Violissi, and also informed Clayton that he would be given an opportunity to respond to the charges recommended by Baldoni at an administrative hearing over which Brymer would preside. The hearing took place on April 16, 2003, with Brymer, Baldoni, Clayton, Clayton's union attorney, and the city attorney in attendance. Baldoni presented the internal investigation report as evidence supporting the charges against Clayton. Plaintiff was given an opportunity to respond but, on the advice of counsel and due to the criminal charges still pending, he elected not to speak at this meeting. Instead, his attorney spoke on his behalf and tried to "shift[] responsibility from Officer Clayton to Capt. Pessina." According to Chief Brymer, "no facts or arguments were presented at [the April 16 hearing] in response to the charges that would change or alter any of the findings or conclusions reached in the IA investigation." Subsequently, on April 28, 2003, Chief Brymer sent a letter to Mayor Thornton recommending Clayton's termination. Thus, facts show that Clayton had ample notice of the charges and evidence against him as required by *Loudermill*.

### B. Opportunity to Respond

Rather, Clayton claims that, for various reasons, he was afforded no meaningful opportunity to respond to the charges against him. First, Clayton argues that the hearing in April 2003 was inadequate because he had no protection against self-incrimination in connection with the pending criminal charges. As a result, he contends, he had insufficient opportunity to be heard in accordance with his due-process rights.

In the analogous context of a criminal defendant's choice between silence or providing alibi witnesses, the Supreme Court observed:

> That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination. The pressures generated by the State's evidence may be severe but they do not vitiate the defendant's choice to present an alibi defense and witnesses to prove it, even though the attempted defense ends in catastrophe for the defendant.

*Williams v. Florida*, 399 U.S. 78, 84 (1970). To allow Clayton to call into question the process he was afforded in his employment dismissal because he wished to avoid incriminating himself in a concurrent criminal investigation would similarly "convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege" would be able to claim that he was afforded an inadequate opportunity to respond. *United States v. Rylander*, 460 U.S. 752, 758, 753 (1983) (holding that in a civil contempt proceeding, asserting one's privilege against self-incrimination was not a substitute for evidence that would assist the respondent in meeting his burden of production).

Faced with the same question in a case where police officers accused of misconduct chose to remain silent during their pre-termination hearing, the Third Circuit concluded:

15

"[t]he fact that appellants had to choose whether to talk or to remain silent offends neither the fifth nor the fourteenth amendment." *Gniotek v. City of Philadelphia*, 808 F.2d 241, 245 (3d Cir. 1986). Citing both *Williams* and *Rylander*, the court explained:

> If there is no constitutional defect when one must choose between possible loss of freedom and self-incrimination, *a fortiori*, there is no defect when one must opt between speaking at an employment termination hearing and asserting the fifth amendment privilege.

*Id.* at 246. The Court finds this reasoning persuasive. Clayton elected not to speak at the hearing, but that does not mean he had no meaningful opportunity to respond. Thus, Plaintiff's decision to invoke his privilege against self-incrimination does not affect the due-process analysis.

Second, Plaintiff claims that the process was flawed because he was never able to invoke the discretion of the final decision-maker and because the hearing was predetermined.[7] While Clayton correctly asserts that "the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect," the pre-termination opportunity to be heard "need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 543, 545–46. Moreover, the Second Circuit has squarely rejected the contention that "a neutral adjudicator is a necessary component of due process at a pre-termination hearing." *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001). As the *Locurto* panel held, "the costs . . . of

---

[7] In other words, Clayton believes that the Mayor needed to be present because she was, in the parlance of our times, "the decider."

additional pre-deprivation guarantees [beyond those enumerated in *Loudermill*] (in this case, a neutral adjudicator) outweigh possible benefits to the employee, given the availability of a full post-deprivation hearing." *Id.*

According to MPD rules, for any disciplinary action up to ten days suspension, the Chief is the final decision-maker (Defs.' Ex. 3, Section 101.11), and the final authority to impose any discipline exceeding ten days rests with the Mayor. It is Chief's role to recommend discipline to the Mayor on the basis of the pre-disciplinary hearing, and the person who presides over the pre-termination hearing cannot preside over any subsequent hearings the employee may have pursuant to the collective bargaining agreement. (Defs.' Stmt. ¶¶ 108–10, Defs.' Ex. 25). The Mayor's role in this process, Clayton describes, "was nothing more than a 'rubber stamp' of Chief Brymer's recommendation." (Pl.'s Stmt. ¶¶ A.137–38.)

Clayton's testimony at his deposition demonstrates that he understood that the hearing with Brymer was his opportunity to tell "[his] side of the story with respect to this incident" prior to the Chief recommending what discipline he would ultimately receive. (Clayton Dep. 178:23–179:1.) Plaintiff also availed himself of the opportunity to tell his side of the story to Baldoni during the course of the investigation. Relying on the evidence adduced through the investigation and on the lack of additional information at the April 16 hearing which would alter any of the recommended charges, Brymer had reasonable grounds to believe that the charges against Clayton were true and, based on the severity of the infractions and Clayton's prior disciplinary history, believed that the evidence supported termination and so recommended to the mayor. Furthermore, although Clayton chose not to avail himself of the Article 23 process, he had further procedural options had he gone

17

through with the May 2003 hearing and lost. Clayton could have filed a union grievance and proceeded to arbitration through a neutral third-party arbitrator (Clayton Dep. 85:11–22), or he could have waived his Article 23 rights and challenged his termination directly through arbitration (Pl.'s Stmt ¶ A.140).

The factual record thus shows that Clayton had several opportunities to be heard prior to being terminated—during Baldoni's investigation, at the April 2003 hearing, and at the cancelled Article 23 hearing. Together with notice of the charges, explanation of the evidence, and the full array of post-termination procedures available, the process afforded Clayton satisfied the constitutional minimum, and *Loudermill* requires no more.

### C. Clayton's Resignation

There is an additional, independent reason why Plaintiff's due-process claim falls short: he retired before the pre-termination procedures had fully concluded. In other words, Clayton is challenging the adequacy of a disciplinary process which he in part rejected.

In *Narumanchi v. Board of Trustees of Connecticut State University*, 850 F.2d 70, 71–72 (2d. Cir. 1988), a tenured teacher claimed that he was disciplined in violation of his due-process rights even though he had failed to take advantage of the grievance procedures provided in his union's collective bargaining agreement. Citing the rule that he need not exhaust state administrative remedies before seeking relief under 42 U.S.C. § 1983, the teacher appealed the district court's dismissal of his due-process claim. *Id.* at 72. But the Second Circuit affirmed, concluding that "the limited procedural rights guaranteed under the circumstances of this case are satisfied by the pre-deprivation notice and hearing rights provided in the grievance procedures under the [collective bargaining agreement]." *Id.* Finding no support for the "assertion of inevitable bias and partiality in a forum whose

composition is specified by the terms of a collective bargaining agreement," the court held that "Narumanchi's failure to submit to the grievance procedures precludes consideration of the fairness of those proceedings in practice." *Id.*; *see also Aronson v. Hall*, 707 F.2d 693, 694 (2d. Cir. 1983) ("Having chosen not to pursue available administrative review, [the plaintiff] is hardly in a position to claim that such review denied him due process.").

Such reasoning applies with equal force in this case. It simply defies logic to permit Clayton to challenge the adequacy of a disciplinary process—one negotiated by his union, no less—which he did not himself utilize. Consequently, for all these reasons, Clayton's due-process claim must fail.

### V.     Conclusion

Accordingly, Defendants' Motion for Summary Judgment [Doc. # 77] is granted. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of July, 2008.